[No. 1511, October 24, 1912.]

STATE OF NEW MEXICO, ex rel, ANTONIO LU-CERO, Relator, v. O. N. MARRON, State Treasurer, Respondent.

### SYLLABUS (BY THE COURT).

1. The legislative department of the state, being a co-ordinate branch of the government, it is the duty of the court, in a doubtful case, to resolve the doubt in favor of the validity of the legislative enactment.

2. The primary object of sec. 16 of article IV of the state constitution was to protect the state treasury against legislative raids, by the prohibition of the insertion of special appropriations for new purposes, in a general appropriation bill, and also to prevent general legislation in such bill, but such constitutional provision does not preclude the insertion in the general appropriation bill of provisions for

the expenditure and accounting for the money appropriated, or other provisions directly connected with the appropriation. The limitation was imposed upon the main act of the appropriation and not the matters of detail connected with such appropriation.

3. When an appropriation is made, there may properly be included in the same act, matter germane thereto and directly connected therewith, such as provisions for the expenditure and accounting for the money appropriated, and the means and methods of raising it, whether it be by taxation, or by some other method.

4. Held: That it was not improper to include in a general appropriation bill, authorization for the issue and sale of certificates of indebtedness, to realize money out of which to provide funds to pay such appropriations, where the legislature had the power, under the constitution to provide for the issue and sale of such certificates.

5. The legislature has the right to determine "necessary" appropriations for educational institutions, created and established by existing law, and to provide therefor in the general appropriation bill. Such appropriations being authorized under the provisions of sec. 16 of article IV, which permits the inclusion of "expenses required by existing law."

6. The word "required," as used in the constitution, meaning "to have need or necessity for."

7. The word "necessary" or "required," as used, in connection with expenses, does not mean those expenses which are absolutely indispensable and without which the government could not be maintained, but it imports no more than that one thing is convenient or essential to another, and the choice of what may be so convenient, useful or essential is necessarily left to the legislature and cannot be reviewed by the courts.

8. Held: That appropriations for the erection of ad-

ditional buildings for state institutions, theretofore estab-
lished and created by existing law, could properly be in-
cluded in the general appropriation bill."

9. Section 7 of article IX of the constitution authorizes.
the issuance and sale of certificates of indebtedness to meet
casual deficits or failure in revenue of the territory of New
Mexico; as all debts, liabilities, etc., of the territory were
assumed by the state.

10. Sec. 7 of article IX does not limit the power of the
legislature to borrow money for expenses "heretofore in-
curred," but the legislature has the power to borrow money
for "necessary expenses," and it must be the sole judge
of the necessity.

Mandamus.

FRANK W. CLANCY, Attorney General.

In the matter of revenue law, 14 Fla. 285; Clark v.
State, 58 So. 683; R. R. Co. v. Reed, 124 Ala. 255; Peo-
ple v. Nellis, 249 Ill. 12; People v. Joyce, 246 Ill. 127;
Comm. v. Wilcox, 111 Va. 855; State v. Ross, 38 Mont.
319; Commonwealth v. Gregg, 161 Pa. 586.

Appropriations for buildings at State educational in-
stitutions can properly be included in a general appro-
priation bill. Guthrie Bank v. Guthrie, 173 U. S. 533;
Coles v. Goehring, 209 Ill. 142.

Appropriations for buildings are for necessary expenses.
M'Culloch v. Maryland, 4 Wheat. 324; Talbot v. Hudson,
16 Gary, 417; People v. Smith, 21 N. Y. 595; Coster v.
Tidewater Co., 18 N. J. Eq. 55; Varick v. Smith, 5
Paige, 137.

E. R. WRIGHT for Appellant.

### STATEMENT OF FACTS.

This is an original proceeding in mandamus, instituted
in this court, by virtue of the jurisdiction conferred upon

this court by section 3 of article IV of the constitution, which invests this court with original jurisdiction in quo warranto and mandamus against all state officers, etc. The information alleges that the relator is, and has been since the institution of the state government, the secretary of state; that his salary is fixed by the constitution of the state; that the legislature of the state, at its first session, passed an act making appropriations for the expenses of the state government, which became law on the 14th day of June, 1912; and that by section 22 of said act there were appropriated various sums of money for the payment of the deficiencies in the revenue of the 61st, 62nd and 63rd fiscal years of the territory of New Mexico, and among such appropriations there was appropriated the sum of $2,625.00 for the salary of relator from the time of the organization of the state government to the end of the current fiscal year, which was the 63rd fiscal year above mentioned. The information then sets out the appropriations made by the next succeeding section of said act for certain educational institutions, and recites that, for the purposes of providing funds for the payment of the appropriations made by said sections 22 and 23, it was enacted that there should be issued certificates of indebtedness of the state of New Mexico. The form, amount and rate of interest of said certificates are set forth, and other facts not necessary to be shown here. The relator then alleges that the respondent is the state treasurer; that he has failed and neglected to execute the certificates and issue them, as required by the act, and prays for the issuance of a writ of mandamus, commanding and directing said treasurer to execute, sign and issue said certificates of indebtedness to the amount of $200,000.00, that being the amount alleged to be necessary, under the provisions of said act.

The respondent voluntarily appeared and filed an answer, wherein he admitted the truth of all the allegations of fact contained in the information and set forth the following reasons for his failure to comply with the act, viz:

"1. The provision and direction contained in section 24 of the general appropriation bill, which became a law

on June 14th, 1912, for the issuance of certificates of indebtedness is invalid because the constitution of the state provides that general appropriation bills shall embrace nothing but the appropriations for the expenses of the executive, legislative and judiciary departments, interest, sinking fund, payments on the public debt, public schools, and other expenses required by existing laws.

"2. The appropriations contained in section 23 of said general appropriation bill, for the purpose of paying for the construction of buildings at three of the state educational institutions are not such appropriations as can be included in a general appropriation bill, as in the last preceding paragraph specified.

"3. The only authority for the issuance of said certificates is to be found in section 7 of article IX of the Constitution of the State, which provides that the State may borrow money not exceeding two hundred thousand dollars ($200,000.00) in the aggregate to meet casual deficits or failure in revenue or for necessary expenses, and this only refers to the revenue and expenses of the State of New Mexico while the appropriations made in Sections 22 and 23 of said general appropriation bill are in part to meet deficits or failure in revenue and for necessary expenses of the Territory of New Mexico.

"4. Many of the items embraced in said section 22 of said general appropriation bill are for salaries and expenses during the current fiscal year which ends on November 30th, 1912, and as these expenses are not yet wholly incurred, they are not of such a nature as can be provided for by borrowing money under the authority of said Section 7 of Article IX of the Constitution.

"5. The payment for the rebuilding of Lea Hall, an academic school building situated on the grounds of the New Mexico Military Institute, which is provided for in said section 23 of said general appropriation bill, is not a necessary expense within the meaning of said section 7 of article IX of the Constitution, nor is it an expense required by existing laws as provided in section 16 of article IV of the Constitution concerning what may be included in general appropriation bills.

State ex rel L. v. Marron, 17 N. M. 304.

"6. The construction of a fire-proof building in place of the old administration building destroyed by fire, to be expended under the direction of the Regents of the New Mexico College of Agriculture and Mechanic Arts, which is provided for in said section 23, is not a necessary expense within the meaning of said section 7 of article IX of the Constitution, nor is it an expense required by existing laws as provided for in section 16 of article IV of the Constitution concerning what may be included in general appropriation bills.

"7. The construction of a dormitory for the Institute of the Blind at Alamogordo, which is provided for in said section 23, is not a necessary expense within the meaning of the said section 7 of article IX of the Constitution, nor is it an expense required by existing laws, as provided in section 16 of article IV of the Constitution concerning what may be included in general appropriation bills. .

"8. The necessary expenses intended by section 7 of article IX of the Constitution are the ordinary current expenses of the State such as salaries, supplies, etc., and do not include such matters as the construction of buildings for the use of said institutions."

The able attorney general prepared and filed the answer for the respondent, but in his brief filed in the cause, after asking careful consideration of the reasons set forth by the respondent for his failure to issue the certificates of indebtedness, he presents his views of the case, which are entirely adverse to the contentions set forth in the answer. It should be further stated by the court that the State treasurer is not opposed to the issuance and sale of the certificates mentioned, but has failed to issue them because of objections raised to their validity, and he deemed it advisable to have the question of their legality determined in advance of sale. No brief, opposing the legality of the bonds, was filed, until the court, being desirous of a full presentation of the matter, requested Hon. Edward R. Wright to prepare a brief and argue the cause orally, presenting to the court such authority and reasoning as could be advanced against the legality of the certificates. This.

he most graciously consented to do, and the court desires to express to him its appreciation of his efforts, and to thank him for the assistance and benefit rendered the court, by his able presentation of the questions involved.

## OPINION OF THE COURT.

ROBERTS, C. J.—Section 22 of Chapter 83 of the acts of the First Legislative Assembly makes appropriations for the payment of deficiencies in the revenue of the 61st, 62nd and 63rd fiscal years of the Territory of New Mexico, the major portion of such deficiencies being due to the change from a territorial to a state government and as no question is raised as to the inclusion of any of these items in the general appropriation bill, it will not be necessary to incorporate the section in this opinion.

Section 23, of the same act, appropriates the sum of $50,000 for the purpose of paying for the construction of Lea Hall, an academic school building situated on the grounds of the New Mexico Military Institute, which was a building used and occupied as apart of the New Mexico Military Institute at Roswell and which was destroyed by fire. Further provision is made for the expenditure of this money by the Board of Regents. The sum of $30,000 is appropriated to be expended under the direction of the Regents of the New Mexico College of Agriculture and Mechanic Arts, near Las Cruces, for the purpose of constructing a fire proof building in place of the old administration building recently destroyed by fire, and for a heating plant for the same. The sum of $25,000 is likewise appropriated for the Institute for the Blind at Alamogordo, for the purpose of constructing a dormitory and providing it with a heating plant and furniture.

Section 24 of the act provides for the issuance of certificates of indebtedness, for the purpose of providing funds for the payment of the appropriations made by sections 22 and 23. The rate of interest, form of the certificates, etc., are provided for by the section.

The certificates were provided for by the legislature under authority conferred by section 7 of article IX of the constitution which reads as follows:

State ex rel L. v. Marron, 17 N. M. 304.

"Sec. 7.  The State may borrow money not exceeding the sum of two hundred thousand dollars in the aggregate to meet casual deficits or failure in revenue, or for neces-essary expenses.  The State may also contract debts to suppress insurrections and to provide for the public de-fense.".

The amount authorized does not exceed the constitu-tional limitation.

The first objection set up in the answer of respondent is that the authority for the issuance of the certificates is invalid because the Constitution provides that, general appropriation bills shall embrace nothing but appropria-tions for the expense of the executive, legislative and judi-ciary departments, interest, sinking fund, payment on the public debt, public schools, and other expenses required by existing laws; the section of the Constitution in ques-tion, is section 16 of article IV, which reads as follows:

"Sec. 16.  The subject of every bill shall be clearly ex-pressed in its title, and no bill embracing more than one subject shall be passed except general appropriation bills and bills for the codification or revision of the laws; but if any subject is embraced in any act which is not express-ed in its title, only so much of the act as is not so ex-pressed shall be void.  General appropriation bills shall embrace nothing but appropriations for the expense of the executive, legislative and judiciary departments, inter-est, sinking fund, payments on the public debt, public schools, and other expenses required by existing laws; but if any such bill contain any other matter, only so much thereof as is hereby forbidden to be placed therein shall be void.  All other appropriations shall be made by sep-arate bills.

Before proceeding to discuss the question of the consti-tutionality of the section of the general appropriation bill, in question, it is perhaps proper to inquire as to the cir-cumstances under which an act of the legislature, a co-ordinate branch of the State government, will be pro-nounced invalid by the judiciary, because of supposed con-flict between the provisions of the act and the organic law of the state.  The law making power is independent of

the judiciary, and when its acts are within the limits of the authority given it by the people, by their will expressed through their constitution, it is supreme. The legislature has the power to determine in what manner its acts shall be drawn, so long as it keeps within the limits fixed by the Constitution, and if it remains within those limits, it is the duty of the courts to give efficacy to its acts, whatever the views of the members of the court may be as to the wisdom of such legislative action. The legislative branch of the government, being a co-ordinate branch of the government, it is the duty of the courts, in a doubtful case, to resolve the doubt in favor of the validity of the legislative enactment. The members of the legislature and the governor are presumed to be familiar with the limitations and restrictions imposed upon the legislative department by the organic law, and it is not to be assumed that inhibitions upon their power will be disregarded. Chief Justice Marshal, in the case of *Fletcher v. Peck*, 6 Cranch 87, in discussing the duty of courts, in approaching the consideration of the question as to the constitutionality of an act of the legislative department, says:

"The question whether a law be void for its repugnancy to the Constitution is at all times a question of much delicacy, which ought, seldom, if ever, be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station could it be unmindful of the solemn obligation which that station imposes; but it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its power and its acts to be considered void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

And Mr. Justice Washington, in the case of *Ogden v. Sanders,* 12 Wheat. 213, gives the reason for the rule, in the following clear and concise language: "But if I could rest my opinion in favor of the constitutionality of the law on which the question arises, on no other ground than this doubt so felt and acknowledged, that alone would, in

my estimation be a satisfactory vindication of it. It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond all reasonable doubt." And Judge Cooley, in his work on Constitutional Limitations (7th ed.) p. 254, after discussing the views of these eminent jurists, says: "The constitutionality of a law, then, is to be presumed, because the legislature which was first required to pass upon the question, acting, as they must be deemed to have acted, with integrity, and with a just desire to keep within the restrictions laid by the constitution upon their action, have adjudged that it is so." Countless other similar expressions of the rule by courts could be quoted, but it is useless to multiply authorities in support of a rule so well settled and so consistently adhered to by the courts. It is disregard of this rule and an apparent presumption against the validity of an act of the legislature, in doubtful cases, which brings upon the courts, at times, adverse criticism.

In the case now under consideration, no question is raised as to the power of the legislature to do what it has done, but the objection is, as to the manner in which it accomplished the result. That it had power to make the appropriations, for the purposes specified, must be conceded, and likewise to provide for the issuance of the certificates of indebtedness, if the purpose for which they were issued comes within the provisions of section 7 of article IX of the constitution, the main objection being as to the form and manner in which they exercised the granted power.

Proceeding now to a discussion of the validity of the sections of the general appropriation bill involved in this case, we will first consider whether the authorization of the certificates of indebtedness was in violation of the prohibition contained in section 16 of article IV of the constitution. The position taken against the validity of the certificates of indebtedness is, that by the section, which is set out in full hereinbefore, nothing can be included in a general appropriation bill except direct appropriations of

money, and that any provision in said bill other than such appropriations, is void. If we looked only at the strict letter of the section in question, without giving any thought to the evident purpose and intent of the framers of the instrument, and the purpose designed to be accomplished, we might be convinced of the correctness of this proposition, but we think a consideration of the section, the object sought to be accomplished, the evil which it was designed to prohibit and the intent of the framers of the section, will compel a different conclusion. The primary object was undoubtedly to protect the state treasury against legislative raids by the insertion of special appropriations for new purposes in a general appropriation bill where they might pass unnoticed, when possible, careful scrutiny and examination of such items upon their merits, if presented separately, would result in their defeat. It was evidently also designed to prevent general legislation in such a bill, in no way related to making provision for the expenses of the government. When the constitution says "general appropriation bills, shall embrace nothing but appropriations" for certain specified purposes, it must mean that no appropriations, other than those specified, would be valid in such a general bill. To sustain the contention that the general appropriation bill should contain nothing, save the bare appropriations of money, and that provisions for the expenditure of the money, or its accounting, could not be included therein; or that the method and means of raising the money appropriated could not likewise be included, would lead to results so incongruous that it must be presumed that the framers of the constitution had no such intent in the adoption of the restrictions referred to. We have examined general appropriation bills of various states, having somewhat similar provisions and some much more restrictive and have failed to find a single act that does not contain some provision for the expenditure and accounting for the money appropriated. To hold that such an act should contain nothing but the bare appropriation of money, would necessitate the framing and passage of numerous separate acts, making provisions for the expenditure and accounting for the money appropriated

by the various items in the general appropriation bill. A brief review of the whole act now under consideration will easily demonstrate the correctness of this conclusion. For instance, in the first section there is an appropriation of a specific sum of money for the payment of the interest on the bonded debt, accompanied by a clause making it the duty of the state treasurer whenever the money on hand is insufficient to meet maturing coupons, to borrow temporarily a sufficient sum to make such payments, and authorizing him to negotiate the necessary loan at a rate of interest not exceeding six per cent per annum and directing the state auditor to countersign any necessary papers for the negotiation of the loan; with a further provision that the surplus of any other fund on hand, not otherwise appropriated, may be first used with which to pay, before borrowing. If the constitutional provision is to be literally construed this authority to use the surplus of other funds or to borrow money would be void. Similar provision, or provisions which would likewise be objectionable in such an act, under this construction, are to be found in sections 2, 5, 6, 12, 13, 14, 18, 21, 25, and other sections not necessary to enumerate, and if the construction contended for could be sustained, then separate acts, covering each of these incidental matters would necessarily be required, making legislation cumbersome in the extreme, and requiring endless detail work on the part of the law-makers, which we can not believe was contemplated by the framers of the constitution. What vice or evil can there be in making provisions in such an act, which are incidental to the main fact of the appropriation? The limitation was imposed upon the main act of the appropriation and not the matters of detail connected with such appropriation. Numerous states have provisions similar to that contained in the first part of section 16 *supra,* which require the subject of every bill to be clearly expressed in its title, and that no bill embracing more than one subject shall be passed, etc., and the courts all uniformly hold that any matter germane to the subject expressed in the title of a bill and naturally related to it, is valid. When an appropriation

is made, why should not there be included with such appropriation matter germane thereto and directly connected with it, such as provisions for the expend - iture and accounting for the money, and the means and methods of raising it, whether it be by taxation, or by some other method? What valid objection can be interposed to such a course, so long as the legislature confines the incidental provisions to the main fact of the appropriation, and does not attempt to incorporate in such act general legislation, not necessarily or directly connected with the appropriation legally made, under the restrictions of the section in question?

There is apparently but very little authority upon the subject. In the State of Florida, where the constitutional provision is somewhat different from our own, providing : "Laws making appropriations for salaries of public officers and other current expenses of the State, shall contain provisions on no other subject," the court has apparently taken the contrary view, but a reading of the cases will disclose that the subject was not well considered, and the opinions were rendered in response to questions propounded by the governor. It will be further noted that the constitutional provision in Florida is stronger and more definite than that used in our constitution, which may in part account for the holding. See in the Matter of Appropriation Bill, 14 Fla. 283, and in Matter of Revenue Law, 14 Fla. 285. In Pennsylvania we find a case which more nearly approaches the present one. The provision of the Pennsylvania constitution was "the general appropriation bill shall embrace nothing but appropriations for the ordinary expenses of the executive, legislative and judicial departments of the commonwealth, interest on the public debt and for public schools; all other appropriations shall be made by separate bills, each embracing but one subject."

The legislature in the general appropriation bill of 1893 appropriated money for the payment of the salary of a clerk in the offices of the prothonotaries of the Supreme Court for the eastern and western districts respectively. One of such clerks attempted to collect his salary, but the auditor-general of Pennsylvania refused to draw and the

State ex rel L. v. Marron, 17 N. M. 304.

State treasurer refused to pay a warrant. The lower court held against the relator on the ground that the legislature could not, within the constitution, in a general appropriation bill increase the compensation of the prothonotaries or create the office of clerk of the prothonotary and provide for his compensation, but that this would have to be done by a separate act of the legislature. The following quotation from the opinion of the Supreme Court is instructive:

"It is uncontroverted therefore that the legislature could do the substantial thing, and the only question is whether it could do it in the present form. In general it will not be disputed that the legislature is the exclusive judge of the form in which its enactments shall be put, and its mandate in that respect cannot be questioned unless it transgresses a plain prohibition in the constitution. The only provision invoked here is section 15 of article 3, 'the general appropriation bill shall embrace nothing but appropriations for the ordinary expenses of the executive, legislative and judicial departments of the commonwealth,' etc. The history and purpose of that section are well known. It was aimed at the objectionable practice of putting a measure of doubtful strength on its own merits, into the general appropriation bill, in legislative phrase tacking it on as a rider, in order to compel members to vote for it or bring the wheels of government to a stop. The same constitutional intent is embodied in section 16 of article 4 giving the governor power to disapprove separate items of appropriation bills. It is the practice of thus forcing the passage of extraneous matters not germane to the purpose of the bill itself, that was intended to be abolished. As to general legislation the same object among others was secured by the provision of section 2 of article 3 that 'no bill, except general appropriation bills, shall be passed containing more than one subject.' General appropriation bills from their nature usually cover a number of items not all relating strictly to one subject. They are therefore excepted from the requirement of section 2, and this exception necessitated special section 15 relating

to them. The object of both is the same." Commonwealth v. Gregg, 161 Pa. 586.

It certainly cannot be contended that the authority for the issuance of the certificates of indebtedness is "extraneous matter not germane to the purpose of the bill itself," the practice of forcing the passage of which was intended to be abolished, as the Pennsylvania court says. We therefore hold that the authorization of certificates of indebtedness was not in violation of the prohibition contained in section 16 of article IV of the constitution.

We shall next consider, together, the causes assigned by the respondent, for his failure and refusal to issue the certificates of indebtedness, in the second, fifth, sixth, seventh and eighth paragraphs of his answer, as they are all directed to the appropriations made for buildings in section 23 of the act. The objection to the inclusion of appropriations for the three educational institutions, in the general appropriation bill, is, that under the limitations in section 16 of article IV of the constitution, an appropriation can not be made for the construction of buildings for educational institutions, although such institutions have been created and established by existing laws. It must be apparent that these appropriations are not for expenses of the legislative, executive or judiciary departments of the government, and if such appropriations can be sustained it must be under the clause of the section of the constitution, which authorizes the inclusion in the general appropriation bill of appropriations for "other expenses required by existing laws." It might be remarked in passing, that this clause of our constitution appears to be peculiar to New Mexico. So far as we have been able to learn, no other state has a similar provision in its constitution, so that we are not enabled to profit by the reasoning of other courts. The use of the words was evidently intended to give to the legislature greater latitude, as to appropriations which could be included in the general appropriation bill. A great many of the states have provisions only for appropriations for the three departments of the government, and it is not to be presumed that the framers of the constitution intended

to use the words above quoted, without effect and to no purpose. What appropriations are "required by existing laws?" Is the word "required" used in the sense of "demand," or "exact"? Clearly it was not so used, because we can conceive of no existing law which could exact or demand, in a strict sense, an appropriation from a succeeding legislature. There might be many existing laws upon the statute books, which would, of right, necessitate, or call for additional appropriations, but certainly no existing law which could compel the legislative department of the government to appropriate money.

Century Dictionary defines the verb "require" as follows:

"1. To search for; seek. 2. To ask as a favor; request. 3. To ask or claim, as of right and by authority; demand; insist on having; exact. 4. To ask or order to do something, call on. 5. To have need or necessity for; render necessary or indispensable: demand; need; want." The word "required" was evidently not intended to be used in the sense ascribed to it in the first four clauses of the definition given, because to give to it such a meaning would render the clause an absurdity and meaningless. But by giving it the meaning of "to have need or necessity for," as it is defined in the 5th definition, full effect is given to the clause of the constitution under consideration. The word "required" or "require," has frequently been defined to mean "necessary" by the courts. See Wilcox & Gibbs Guano Co. v. Phoenix Insurance Co., 60 Fed. 929; F. & P. M. R. R. Co. v. D. & B. C. R. R. Co., 64 Mich. 550, where the court holds that the word "require" is frequently used in the sense "to need" or "to be requisite." The word having then been used in the sense of "necessary" or "requisite", it remains to determine whether the appropriations made for the new buildings at the educational institutions were necessary or requisite, under existing laws. And the question naturally suggests itself, as to the power or right of the court, to determine or adjudge of the necessity for the reconstruction of the buildings, for which

the appropriations were made. The legislative department of the government, whose special duty it is, to inquire into and determine the requirements and necessities of the various State institutions, has already supposedly, investigated the question, heard evidence, if such were necessary, and has determined and by its enactment recorded the fact that such necessity existed, in order that such institutions could properly perform and carry out the functions and fulfill the purposes of their creation. Each of the institutions, for which the appropriations were made, was established by the territorial legislature many years ago; all were confirmed by the constitution as State educational institutions.

These institutions, having been created "by existing laws," appropriations for increased facilities to meet the needs of the people and accommodate the increased attendance and requirements of the students are necessary to enable them properly to accomplish the purposes of their creation, and in that sense, are not such appropriations "required by existing laws," or at least was it not incumbent upon, and was not the legislature the sole judge of the necessity, so long as it is not manifest, that the provisions of the constitution has been used as a cloak to hide some ulterior design and to make an unwarranted raid upon the treasury?

Now, does the word "necessary" or "required," as used in the constitution, import an absolute physical necessity, from which there is no escape; an overpowering and compelling need, and is it only such requirements of existing laws for which appropriations may be made by the legislature? We do not think such a meaning should be given to the words, but rather they should receive the interpretation, given to the word "necessary," by the Supreme Court of the United States, in the case of M'Culloch v. Maryland, 4 Wheat. 324, when it had before it the clause of the constitution of the United States empowering congress to pass all laws "necessary and proper" to carry into execution the powers conferred upon it, where in the court uses this language:

"But the argument on which most reliance is placed, is

drawn from the peculiar language of this clause. Congress is not empowered by it to make all laws, which may have relation to the powers conferred on the government, but such only as may be "necessary and proper" for carrying them into execution. The word 'necessary' is considered as controlling the whole sentence, and as limiting the right to pass laws for the execution of the granted powers, to such as are indispensable, and without which the power would be nugatory. That it excludes the choice of means, and leaves to congress in each case, that only which is most direct and simple.

"Is it true that this is the sense in which the word 'necessary' is always used? Does it always import an absolute physical necessity, so strong that one thing, to which another may be termed necessary, cannot exist without that other? We think it does not. If reference be had to its use, in the common affairs of the world, or in approved authors, we find that it frequently imports no more than that one thing is convenient, or useful, or essential to another. To employ the means necessary to an end, is generally understood as employing any means calculated to produce the end and not as being confined to those simple means, without which the end would be entirely unattainable. Such is the character of human language, that no word conveys to the mind in all situations one single definite idea; and nothing is more common than to use words in a figurative sense. Almost all compositions contain words, which, taken in their rigorous sense, would convey a meaning different from that which is obviously intended. It is essential to just construction, that many words which import something excessive should be understood in a more mitigated sense—in that sense which common usage justifies. The word 'necessary' is of this description. It has not a fixed character peculiar to itself. It admits of all degrees of comparison; and is often connected with other words, which increase or diminish the impression the mind receives of the urgency it imports. A thing may be necessary, very necessary, absolutely or indispensably necessary. To no mind would the same idea be conveyed by these several phrases. This comment on

the word is well illustrated by the passage cited at the bar, from the 10th section of the first article of the constitution. It is, we think, impossible to compare the sentence which prohibits a state from laying 'impost or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws,' with that which authorizes congress 'to make all laws which shall be necessary and proper for carrying into execution the powers of the general government, without feeling a conviction that the convention understood itself to change materially the meaning of the word 'necessary,' by prefixing the word 'absolutely.' This word, then, like others, is used in various senses; and, in its construction, the subject, the context, the intention of a person using them, are all to be taken into view."

We must conclude therefore, that "necessary" or "required," in connection with expenses, does not mean those expenses which are absolutely indispensable and without which government could not be maintained, but that it "imports no more than that one thing is convenient or useful or essential to another," and that the choice of what may be so convenient, useful or essential, is necessarily left to the legislature and cannot be reviewed by the courts.

To give to the words of the constitution, the construction contended for by the respondent, would deny to the legislature the right to include in the general appropriation bill, appropriations for the maintenance and repair of any of the State institutions. For instance, there is an act of the territorial legislature, providing for the erection of the capitol building in Santa Fe. The act providing for the construction of the building makes no provision for its future repair, and because of the failure to make provision in this regard, shall we assume that there is no "existing law," which requires the building to be kept in repair, so that it may fulfill the purposes for which it was established? To so hold would mean that no appropriation could be included in the general appropriation bill, out of which incidental repairs could be made, but, that, all such appropriations would necessarily have to be made by a

State ex rel L. v. Marron, 17 N. M. 304.

separate bill, the subject of which must be clearly expressed in the title, and which could not embrace more than one subject. The endless legislation which such a construction would entail is very apparent and manifestly the constitutional convention did not mean so to require.

Where there is an existing law, under which an institution has been established by the State, and which was within the power of the legislature to establish, the legislative department of the government must be the sole and exclusive judge of what is required for such institution in the way of expenses under existing laws. The same principle should apply, as that applicable to the provision so common in State constitutions, that no local or special law shall be enacted where a general law can be made applicable. The general current of authority is that this is a legislative and not a judicial question and that the determination of the legislature is final. Guthrie Bank v. Guthrie, 173 U. S. 533. We do not mean to be understood as holding that the court could not, in any case, review the action of the legislature, in making appropriations, for the legislature might make an appropriation for an entirely new purpose, not authorized by an existing law, which would clearly be in violation of the constitutional restrictions, should it be included in the general appropriation bill. But where, as in the present case, the legislature makes an appropriation for existing institutions, created and established by separate act prior to the making of the appropriation, the legislature has not transcended the powers granted it by the people through their constitution, by reason of the inclusion of such appropriation in the general appropriation bill; such an appropriation being an appropriation required by existing law, as determined and ascertained by the legislative department of the government.

The third objection urged by respondent to the validity of the certificates of indebtedness is that the authority for the issuance of the certificates, or the borrowing of money, which is found in section 7 of article IX *supra*, refers only to casual deficits, or failure in revenue, or to necessary expenses of the State of New Mexico, while the appropria-

tions, to meet which the certificates of indebtedness are to be issued, are in part on account of deficits, or failure in revenue, or necessary expenses of the territory of New Mexico. No plausible reason has been suggested for making such a distinction. The state is, as to such matters the mere successor of the territory and the government proceeds without any break in its fiscal affairs. In no other way can effect be given to sections 4 and 12 of article XXII of the constitution. Section 4 provides that all laws of the territory not inconsistent with the constitution shall continue and remain unaffected by the change; all rights, actions, claims, contracts, liabilities and obligations shall continue and remain unaffected by the change in the form of government; while section 12 provides that all lawful debts and obligations of the territory of New Mexico not assumed by the state, shall remain valid and unaffected by the change of government. Section 12 was made necessary by the peculiar provisions of the enabling act, which required the state to assume the payment of the debts and liabilities, which were valid and subsisting on June 20, 1910, which said debts were assumed by section 1 of article IX of the constitution, and the provisions of section 12 were intended to provide for the validity of the debts thereafter contracted by the territory. The debts of the territory having become liabilities of the state, and the appropriations having been made to pay deficiencies incurred by the requirements of existing laws, there can be no reason assigned why the state may not issue certificates of indebtedness or borrow money with which to pay such debts, so long as such certificates, or other evidence of indebtedness, do not exceed the constitutional limitations. If the debts and obligations of the territory remain valid and unaffected by the change of government, it must be that the state is responsible for them, and is bound to pay any such debts, whether incurred under the territorial government or after the organization of the state government and there can be no reason assigned for limiting the power of borrowing money for deficiencies.

to expenses of the state as distinguished from those of the territory, which, by the change of government, have become deficits and expenses of the state.

There is no merit in the fourth objection interposed by respondent in his answer. Sec. 7 of article IX of the constitution gives the state the power to borrow money, not exceeding the sum of $200,000.00 in the aggregate to meet casual deficits, or failure in revenue, or for necessary expenses. It does not limit the power to expenses, heretofore incurred. It is true that many of the items included in the bill are for salaries up to the end of the current fiscal year; salaries fixed by the constitution, and as to these items there can be no doubt that they are fully incurred. And these and all other items, for which provision is made by the issue of the certificates, the legislature has determined to be necessary expenses, and it is to be assumed that there are no revenues now available, or which will be available during the current fiscal year out of which to meet such requirements. It is to be borne in mind that we had no session of the legislature in 1911, and that the expenses of the current year have been necessarily increased by reason of the change from a territorial to a state government, and that no money was available to meet the increased expense. The inadequacy of the appropriations made by the legislature of 1909 must have been apparent to the first state legislature. If the contention of the respondent is correct and if the legislature has no authority to borrow money to pay the deficiencies in the revenue of the territory, then, with no session of the territorial legislature since 1909, and the consequent impossibility of having lgislation to meet exigencies which could not have been forseen at the time of that session and which therefore were not then provided for, we would be left helpless as to meeting deficiencies or failure in revenue during the past three years, and, as well, the increased expenses incident to the change of government. Much that we have said heretofore in this opinion, as to legislative determination of what are necessary expenses, and the lack of power in the court to review this.

determination, applies with equal force to respondent's fourth contention.

The answer of respondent, presenting no valid or legal reason, for his failure to execute, sign and issue the said certificates of indebtedness, the writ of mandamus will issue as prayed for by the relator. And it is so ordered.