State *ex rel.* Manhattan Const. Co. *et al.* v. Barnes, *Mayor, et al.*

No. 333.    Opinion Filed September 12, 1908.

(97 Pac. 997.)

1.   MUNICIPAL CORPORATIONS—Power to Incur Indebtedness— "Public Utility." A convention hall, to be owned, controlled, and used exclusively by a city, to accommodate public gatherings of the people of the city, and for such other public uses as may be designated by the mayor and city council, is a "public utility," within the meaning of that term as used in section 27, art. 10, of the Constitution (Bunn's Ed. sec. 293.)

2.   ELECTIONS—City Elections—Repeal of Statutes. The act of the Legislature, approved May 29, 1908 (Laws 1907-08, p. 316, c. 31), providing a general election law, did not repeal section 9, art. 1, c. 12 (section 354) Wilson's Rev. & Ann. St. Okla. 1903

3.   SAME—Registration—Repeal of Statute. Said act did repeal article 2, c. 13, p. 157, Sess. Laws Okla. 1903, entitled "An act to require the registration of voters in cities of the first class."

4.    **SAME—Registration—Special Elections.** Subarticle 8 of said act of the Legislature approved May 29, 1908 (Laws 1907-08, p. 352, ·c. 31, art. 1), providing a system of registration in cities of the first class, does not apply to special city elections in such cities, and applies only to primary and general elections in the state, for the purpose of nominating and electing state, county, and township or precinct officers.

5.    **SAME—Harmless Irregularities.** The failure of the inspectors, judges and clerks of an election to take the oath prescribed by law, in the absence of fraud in the election and of collusion or willful neglect on the part of said officers to take such oath, does not invalidate the election.

(Syllabus by the Court.)

Application by the state, on relation of the Manhattan Construction Company and H. M. Fielding, for a writ of mandamus to C. M. Barnes and others.    Writ granted.

This is an original action brought by the state, on the relation of the Manhattan Construction Company, a corporation, and H. M. Fielding against C. M. Barnes, as mayor, and E. W. Kinnan, as city clerk, of the city of Guthrie. Plaintiffs seek by their petition to have issued a writ of mandamus directed to the defendants, commanding them to execute and deliver to the city treasurer of said city certain utility bonds, in accordance with an ordinance of said city. An alternative writ was issued at the time plaintiffs filed their petition, to which defendants have filed their return, together with an agreed statements of facts, and the case is submitted upon plaintiffs' petition, defendants' return to the alternative writ, and the agreed statement of facts. . The facts will be stated in the opinion.

*Cottingham & Bledsoe,* for plaintiffs.
*Tibbetts & Green,* for defendants.

HAYES, J.    This action arose out of an attempt of the city council of the city of Guthrie to issue bonds under section 27, art. 10, of the Constitution (Bunn's Ed. § 293), for the purpose of building a convention hall in said city.    On the 6th day of June, 1908, the mayor and city council of the city of Guthrie duly

adopted a resolution, authorizing and directing the mayor to issue a call for an election by the qualified voters of the city to vote for bonds running 25 years from date, for public utilities and city improvements within the city. A convention hall is one of the public utilities named in said resolution. Pursuant to this resolution the mayor, on June 9, 1908, issued a call for a special election of the qualified taxpaying voters of the city to be held on the 23d day of June, 1908. This proclamation was published, as by law required. By the last paragraph of the proclamation the city clerk was directed to open registration books at once, and to keep the same open until Saturday, the 20th of June, 1908, for the purpose of registering the qualified taxpaying voters of the city. The election was held, and it is agreed that, except as to the method of registration, and the oaths taken by the judges, inspectors, and clerks of said election, the same was conducted and held in substantial compliance with the election laws of the state governing special elections in cities of the first class, and in substantial compliance with the general election laws of the state in so far as same apply to special elections in cities of the first class; that the election was conducted without fraud, and the result thereof was properly certified and declared; that no one but the persons qualified under section 27, art 10, of the Constitution were permitted to vote at said election, and that no one who was qualified under said section was refused permission to vote, although not registered. On the 26th of June, 1908, the city council in regular session canvassed the vote and the returns of said election, and declared the result upon the various propositions submitted at said election. The vote upon the question whether bonds should be issued for the purpose of constructing a convention hall was declared to be 937 for the proposition, and 39 against.

The city council, in obedience to the declared will of the qualified voters of the city of Guthrie expressed at said election, proceeded to issue public utility bonds in the sum of $150,000 for the construction of the convention hall, and sold the same to peti-

tioners and by resolution authorized and directed that the city treasurer deliver same to the petitioners as soon as prepared and executed by the proper officers of the city.    The issuance of said bonds was authorized by an ordinance of the city council, passed in regular session, and the bonds were prepared in due and regular form, but the mayor and city clerk refused to sign, execute, or deliver same to the city treasurer, to be delivered to petitioners. Petitioners stand ready to perform the conditions of their contract of purchase of said bonds, and in their petition seek to have the city authorities required to perform the contract.    Defendants by their return to the alternative writ present three alleged reasons why they refuse to execute and deliver the bonds as prayed for, and three defenses against petitioners' right to the relief prayed for in their petition.   They contend:   First, that a convention hall is not a public utility; second, that no proper registration of voters was had before the election was held; third, that the election officers did not take and subscribe to the oath prescribed by law.   We shall discuss these propositions in the order named.

Section 27, art. 10, of the Constitution (Bunn's Const. § 293), under which the city council is attempting to issue the bonds in question, reads:

"Any incorporated city or town in this state may, by a majority of the qualified property taxpaying voters of such city or town, voting at an election to be held for that purpose, be allowed to become indebted in a larger amount than that specified in section twenty-six, for the purpose of purchasing or constructing public utilities, or for repairing same, to be owned exclusively by such city:   Provided, that any such city or town incurring any such indebtedness requiring the assent of the voters as aforesaid, shall have the power to provide for, and, before or at the time of incurring such indebtedness, shall provide for the collection of an annual tax in addition to the other taxes provided for by this Constitution, sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof within twenty-five years from the time of contracting the same."

The term "public utility," as used in this section of the Constitution, was before this court for construction in *State v. Millar,* 21 Okla. 448, 96 Pac. 747. In that case it was held that sewers are public utilities within the meaning of the term as used in the Constitution, and *Valley City Salt Co. v. Brown,* 7 W. Va. 191, in which the term "public utility" is construed as being synonymous with "public use," was cited with approval. The term "public use" has frequently been defined by the courts in connection with eminent domain statutes and in connection with the provision of the Constitution of the United States, and the provisions found in the Constitutions of most of the states, to the effect that private property shall not be taken for public use without just compensation. A review of the authorities soon discloses that there are two well-defined views as to what constitutes a "public use." One is that a use to be a public use must be a use, or right of use, on the part of the public or some limited portion of it; and the other is that it must be a public benefit utility, or advantage.

The latter view we find expressed by Mr. Tiedeman in his work on State and Federal Control of Persons and Property, p. ·692, in the following language:

"The ever-increasing complications of modern civilization have compelled an application of the right of eminent domain to other than public or governmental uses, and the meaning of the term 'public' was broadened, from time to time, in order to cover these new applications of the right, until now the term is synonymous with the term 'public good.'"

In *Olmstead v. Camp,* 33 Conn. 532, 89 Am. Dec. 221, the court defines "public use" to mean public utility, advantage, or what is productive of public benefit. In *Seely v. Sebastian et al.,* 4 Or. 25, the same term was held to mean for the use of many, or, where the public is interested. Other cases holding that a "use" is a public use when it is for the public good are: *Hand Gold Min. Co. v. Parker et al.,* 59 Ga. 419; *Chas. P. Talbot et al. v. Chas Hudson et al.,* 16 Gray (Mass.) 417; *Amoskeag Mfg. Co. v. Head,* 56 N. H. 386.

The former definition is supported by numerous cases, in which it is held that, to constitute a public use, the property must be taken into the direct control of the public or of public agencies, or the public must have the right to use in some way the property appropriated. *Varner v. Martin,* 21 W. Va. 534; *Twelfth St. Market Co. v. Philadelphia & R. T. R. Co.,* 142 Pa. 580, 21 Atl. 902, 989; *Sholl v. German Coal Co.,* 118 Ill. 427, 10 N. E. 199, 59 Am. Rep. 379; *In re Rhode Island Suburban Ry. Co.,* 22 R. I. 445, 48 Atl. 590; *Budd v. People,* 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247; *In re Eureka Basin Warehouse & Manufacturing Co.,* 96 N. Y. 42.

Mr. Lewis, in his excellent work on Eminent Domain, in discussing these two different views as to what constitutes a "public use," distinguishes them as follows:

"To constitute a public use according to the first of these definitions, it is necessary that the public should in some way use, or be entitled to use or enjoy, the property taken. According to the second definition, it would be a public use if the property taken was so employed as to inure in any way to the public benefit or advantage."

After approving the first of these definitions as the correct· one, he proceeds to define "public use" in the following language:

"The public use of anything is the employment or application of the thing by the public. Public use means the same as use by the public." (1 Lewis, Eminent Domain, p. 417.)

Judge Cooley expressed the same thought in the following words:

"The public use implies a possession, occupation, and enjoyment of the land by the public at large, or by public agencies." (Cooley's Constitutional Limitations [7th Ed.] p. 766.)

And we find, in *Gilmer v. Lime Point,* 18 Cal. 239, citing an early New York case, a similar rule laid down as a criterion by which a "public use" may be determined in the following language:

"If the state or sovereign power take the property and keep control over it, so as to compel its devotion to the purpose avowed in expropriating it, then the taking is for a public use. If not,

the taking is for a private use, and by implication forbidden by the organic law."

It is unnecessary, however, for us to consider further the relative merits of these two different views, or to determine which one is correct. Under the facts admitted by the pleadings and agreed to in the statement of facts filed in this case, the use or the utility under consideration meets all the requirements of both views. Said convention hall is to be constructed exclusively by the city of Guthrie, and is to be a public building owned exclusively by the city, and to be used by the public in accommodating any public gathering of the people of the city, at any and all times desired, and for such other public uses as may be designated by the mayor and council.

*Varner v. Martin, supra,* is one of the most exhaustive and best-reasoned cases that has been brought to our attention in which the question now before us is discussed. Mr. Justice Green, who delivered the opinion of the court in that case, in discussing what constitutes a "public use" said:

"This, it will be found, depends largely upon whether the property condemned is under the direct control and use of the government or public officers of the government, or, what is almost the same thing, in the direct use and occupation of the public at large, though under the control of private persons or of a corporation—these together constitute one class—or whether it is in the direct use and occupation of private persons or of a corporation, and the general public has only an indirect and qualified use of the property condemned, or perhaps no use properly of any kind of the property condemned, but simply derives from its use by and for a private person or corporation some indirect advantage, as by the promotion of the general prosperity of the community; these together constituting a second class."

To the first of these classes he assigns all cases where the land is authorized to be condemned for public buildings, public parks, canals, and turnpikes, and then says:

"Where the land is condemned for public buildings or a public park or the like, and public officers have complete control of the property, the act of the Legislature authorizing the condemna-

tion is clearly constitutional, for the use for which the property is condemned is obviously a public use."

The local necessity for the public building in the case at bar has been determined by the legislative body of the city of Guthrie, and by an almost unanimous vote of the qualified taxpaying voters of the city, and such question is properly one for legislative control. It is true the question whether the use is a public use is always ultimately a question for judicial determination; but, where the legislative judgment has been declared as to whether a given use is a public use, that judgment will not be overturned by the courts. unless it is clearly apparent that the same is without reasonable foundation. 2 Dillon on Municipal Corporations, p. 703; Cooley's Constitutional Limitations (7th Ed.) p. 777; *Logan v. Stogsdale,* 123 Ind. 372, 24 N. E. 135, 8 L. R. A. 58; *United States v. Gettysburg Electric Ry. Co.,* 160 U. S. 668, 16 Sup. Ct. 427, 40 L. Ed. 576; *Tuttle et al. v. Moore et al.,* 3 Ind. T. 712, 64 S. W. 585. The Supreme Court of the United States in *United States v. Gettysburg Electric Ry. Co., supra,* declared that, where the intended use is for the government. the presumption that it is a public use is stronger than when such intended use is to be exercised by a private corporation to which has been delegated the power to exercise the right of eminent domain.

By act of the Legislature, approved May 27, 1908 (Laws 1907-08, p. 159, c. 7, art. 2), provision is made for the holding of elections in cities having a population of over 8,000 inhabitants, for the purpose of determining whether such city shall issue bonds for the purpose of purchasing a site for and constructing a convention hall. This act of the Legislature did not become effective until 90 days after the expiration of the adjournment of the session at which it was passed, and was therefore not in force at the time the election was held in the case at bar, or at the time of the filing of this suit, and therefore does not in any way directly affect the contentions made herein, but such act of the Legislature is a contemporaneous legislative construction of said section 27 of article 10 of the Constitution of this state, and clearly declares

it to be the judgment of the legislative department of the state that the term "public utilities," as used in that section of the Constitution, includes convention halls.   If the court had reason to doubt that a convention hall of the character, and constructed for the purpose and controlled in the manner, of the one in the case at bar is to be a public utility within the meaning of said section of the Constitution, such act of the Legislature would be persuasive upon this court.   In a government where the right of public assembly for the redress of grievance is guaranteed to the people, where the policies of government are in a great measure determined at public gatherings of the people in political conventions, where the lecture platform has become so important a factor in public education, and where people frequently assemble for the purpose of discussing and devising ways and means of promoting their varied interest, a place in large cities where such gatherings may be had under comfortable hygienic conditions is not only a public convenience and benefit, but a public necessity.   We know of no case in which the question of whether a convention hall is a public use has been determined, but courthouses, jails, schoolhouses, city halls, public markets, almshouses, public parks, boulevards, commons or pleasure grounds, and places of historic interest are examples of uses that have been declared by the courts to be "public uses." 2 Abbott's Municipal Corporations, pp. 1828-1830.   And the reasoning upon which the courts have declared that these various uses are public uses is applicable to the case at bar.

The election held for the purpose of determining whether the majority of the qualified property taxpaying voters of the city approved the issuance of bonds for the purpose of constructing the convention hall was called and held under the provisions of article 1, c. 12, §§ 346-357, 1 Wilson's Rev. & Ann. St. Okla.

Section 9 (section 354) of this article and chapter reads:

"The places of holding elections, annual and special shall be designated by the mayor.   He shall issue a proclamation for every such election, giving at least ten days' notice thereof, announcing place in each ward, where the same is to be held, and he shall

also designate in each ward, three electors, to act as judges, and two electors to act as clerks of such election. The polls shall be opened and closed at the hours as provided by the general election laws. Vacancies in the offices of judge and clerk of elections shall be filled and all matters not provided for herein pertaining to the manner of conducting such elections shall be as provided for by the general election laws of the territory."

Among the laws extended in force in the state by the provisions of the Constitution was article 2, c. 13, p. 157, Sess. Laws Okla. 1903, providing for a system of registration of voters in cities of the first class. Section 1 of this article provides that the city clerk of any city of the first class shall keep in his office books for the registration of voters in said city, and that he shall enter thereon the name, age, and residence, by ward or precinct, of all voters who may apply to him for registration. It provides the time during which voters may apply for registration, and further provides that the city clerk shall keep his office open for such purpose for a specific number of days before any general or special election. Section 3 of this article reads:

"Before any person shall be permitted to vote in cities of the first class in this territory at any general or special election held in the territory, or at any election held in cities of the first class, he shall have registered with the city clerk, as herein provided, giving his name, his age and the ward or precinct in which he resides and the number of his residence.　*　*　*"

The mayor, acting under these provisions of the statute, when he issued his proclamation calling the election, in the last paragraph of his proclamation directed the city clerk to open his registration books for the purpose of registering voters, and that a special registration of the qualified taxpaying voters of the city be made up by wards. A special registration was made by the city clerk, as directed by the mayor. Only persons qualified under said section 27, art. 10, of the Constitution were registered, but at the election all persons possessing the qualifications prescribed by said section, whether registered or not, who offered to vote, were permitted to vote.

On May 29, 1903, prior to the calling of the election by the mayor, an act of the Legislature, providing a general election law for the state, was approved by the Governor. Said act provided for a system of registration in cities of the first class entirely different from the system provided by article 2, c. 13, Sess. Laws 1903, and it is contended by defendants that the act of May 29, 1908 (Laws 1907-08, p. 316, c. 31), repealed article 2, c. 13, Sess. Laws 1903. The act of May 29, 1908, contained an emergency clause, and became effective upon its approval by the Governor. Section 28 of said act provides that all laws, and parts of laws, governing general elections in the state are thereby repealed. It is clearly apparent that by this section of the act the system of registration provided by said chapter 13, Sess. Laws 1903, was repealed, for the reason that said chapter constituted a part of the general election laws of the state. It then appears that the registration made by the city clerk was attempted to be made under a statute no longer in force, unless section 9 of chapter 12, *supra,* was unaffected by the act of May 29, 1908, and the language of said section that "all matters not provided for herein pertaining to the manner of conducting such elections shall be as provided for by the general election laws of the territory" had the effect to incorporate bodily into the provisions of said article 1, chapter 12, governing special elections in cities of the first class, the general election laws of the state and the statute of 1903, providing for a system of registration. We do not think that the provisions of article 1, chapter 12, governing annual and special elections in cities of the first class, were repealed by the act of May 29, 1908. The repealing clause of said act of the Legislature is that "all laws governing general elections in the state are repealed." The provision of article 1, chapter 12, does not apply to general elections in the state, and only applies to annual and special elections held in cities of the first class, and we have been unable to find anything in said act of the Legislature that in our opinion effects a repeal by implication of the provisions of said chapter. If, as be-

fore stated, the language contained in the latter part of section 9, *supra,* had the effect to incorporate the provisions of the general election laws of the territory, including the registration laws of 1903, into the provisions of said article 1, c. 12, Wilson's Rev. & Ann. St. Okla. 1903, then the repeal of the general election law by the late act of the Legislature would only affect such laws in so far as they applied to general elections, but would remain in force in so far as they applied to annual and special elections in cities of the first class. 2 Lewis' Sutherland on Statutory Construction, p. 787. But we do not think the language of section 9 can be construed as an adopting statute, incorporating into the provisions of the chapter of which said section is a part the general elections laws of the state, for the reason that said section does not refer to any specific general election law, or to any chapter or section of any law then in force but merely provides that, where not otherwise provided by said chapter pertaining to cities of the first class, the manner of conducting elections in such cities should be as provided by the general election laws of the state. Lewis' Sutherland on Statutory Construction (volume 2, p. 787 [latter part of section 405]) said:

"There is another form of adoption, wherein the reference is, not to any particular statute or part of a statute, but to the law generally which governs a particular subject. The reference in such case means the law as it exists from time to time, or at the time the exigency arises to which the law is to be applied. The Supreme Court of Illinois says: 'Where, however, the adopting statute makes no reference to any particular act by its title or otherwise, but refers to the general law regulating the subject in hand, the reference will be regarded as including, not only the law in force at the date of the adopting act, but also the law in force when the action is taken, or proceedings are resorted to.'"

Without the aid of this rule of construction, however, the act of 1903, providing for a system of registration, could not be construed as having been incorporated into the provisions of said chapter 12 by the language of said section 9 thereof, for the reason that, at the time that said chapter 12 was adopted, the act of

1903 had not been passed. We are therefore of the opinion that the act of May 29, 1908, repealed for all purposes the general election laws theretofore existing in the state, including the provision of the act of 1903 providing for a system of registration.

It remains for us to determine whether the provisions of the act of May 29, 1908, prescribing a system of registration for cites of the first class, applies to special elections in such cities. Section 1 of article 8 of this act reads:

"There is hereby created and established a registration system in the various cities of the first class in the state of Oklahoma for the registration of electors, and no elector shall be allowed to vote in any election held in such cities unless he has complied with the provisions hereof."

The language of this section, construed alone, would possibly indicate that it was the intention of the Legislature to provide one system for registration, both for general elections and primary elecions provided for in said act, and also for city elections held in cities of the first class; but section 14 of article 8 of the act reads:

"It shall be the duty of the precinct inspector of elections to have at the polls on each election day, whether in primary or general elections, after the registration herein provided for, the books or duplicates of registration certificates for said precinct."

And section 18 of said article of said act reads:

"Certificates of registration shall entitle electors who rightfully hold the same to vote at all elections held after the date of said registration, and before the next biennial registration whether such election be primary or general."

It will be noticed that the language "on election day" in section 14 and "at all elections" in section 18 is limited, in each section, by the subsequent phrase "whether such election be primary or general." The registration system provided for in the act is made a part of the election machinery for holding primary elections and general elections for the purpose of nominating and electing state, county, and township, or precinct officers. The act provides for a state election board, to consist of three persons appointed by the Governor, which board appoints county election

boards, to consist of three persons, and the county election board, in turn, appoints the election board for each precinct of the county, and it is made the duty of the inspector of election, thus appointed by the county board, to prepare the registration in his precinct. Such registration under the provisions of the act must be begun on the first day of July preceding each biennial primary election, and continue until the last Saturday night of said month. By another section of the act it is provided that, during the last week of the month of October preceding the general election to be held in November, the inspector of elections shall keep open his books of registration, for the purpose of registering those who have become legal voters in the precinct since the primary election held in August preceding, and for the registration of those who will be entitled to vote at the general election in November.

No other provision is made for the registration of voters. It is therefore apparent that the registration system provided by this act would be inadequate for the purpose of special elections in cities of the first class or in counties. If an election should be called in a city of the first class, to be held, say, in the month of February, for the purpose of having the voters vote upon any question, such as was submitted to the voters in the election in the case at bar; or if an election be held in the county for the purpose of having the voters of the county vote upon the question of whether the county seat should be removed, or upon any other question that might be submitted in a city or county at a special election, under the registration provisions of the act, if applicable to such elections, one who became a qualified voter of such county, or of a precinct thereof, who was not a qualified voter of such county or precinct at the last preceding general election would have no opportunity to register, for the reason that the last opportunity to register is afforded during the last week of October preceding the general election. The date of the general election is fixed by the act on the first Tuesday in November in 1908, and on the same date every two years thereafter. To hold that the registration system provided by the act applies to special election in cities of

in counties would be to hold that the Legislature has enacted a law requiring the voter to register before he shall be entitled to vote, and at the same time providing no means or opportunity, during a period of 20 months out of every two years, for a person who becomes a qualified voter in any precinct subsequent to the last preceding general election to register for the purpose of voting at any such special election, held during such period of 20 months. In the absence of express language in the act making said provisions applicable to other than primary and general elections for the purpose of nominating and electing state, county, and precinct officers, we conclude that the Legislature had no such intention, and that the registration provided in said act does not apply to the election in this case by reason of any provision of the act.

Nor do we think that such law is made to apply by the last paragraph of section 9, c. 12, Wilson's Rev. & Ann. St. Okla., *supra*. That section makes applicable the general election laws of the state to annual and special elections in cities only to the extent that it provides that all matters not provided for in said chapter, pertaining to the manner of conducting such elections shall be as provided for by the general election laws. The preceding section of that chapter fixes the date on which the annual and special elections in cities shall be held. The first paragraph of said section 9 prescribes the procedure governing such elections up to the time of opening the polls. The last paragraph of the section prescribes the procedure governing such elections from the opening of the polls to the closing thereof, and the general election law governs the manner of conducting such elections in all those matters which are not provided for by the chapter, but the registering of voters constitutes no part of the conducting of such elections. The registration law existing prior to the passage of the act of May 29, 1908, was made applicable to annual and special elections in cities of the first class, not by virtue of said section 9, but by specific language of said law. Section 3, art. 2, c. 13, Sess. Laws Okla. 1903. At the time the election in the case at bar was held, there was therefore no law providing or requiring registration of voters for

such elections in cities of the first class. Section 27 of article 10, *supra,* of the Constitution does not make registration one of the qualifications of a voter voting at any election provided for therein. The qualifications prescribed by said section are that he shall be a qualified property taxpaying voter; in other words, that he shall possess the qualifications prescribed by section 1, art. 3, of the Constiution (section 43, Bunn's Const. Okla.), and in addition thereto be a property taxpayer. It was within the power of the Legislature to provide a system of registration by which a qualified voter, under said provision of the Constitution, might be ascertained, but, not having done so, the registration made by the city clerk of Guthrie neither contributed to nor affected adversely the legality of the election.

The election officers in the various precincts of the city, who held and conducted the election, took and subscribed to the oath prescribed by the general election laws, repealed by the act of May 29, 1908. The oath prescribed by the late act of the Legislature is in some respects similar to the oath prescribed by the former law, but in other respects is dissimilar, and it is contended that, by reason of the failure of the election officers to take and subscribe to the oath perscribed by the act of May 29, 1908, the election is invalid. The taking and subscribing to an oath by the election officers constitutes a part of the procedure of conducting an election, and, not having been provided for by the provisions of said chapter 12, Wilson's Rev. & Ann. St. § 9, *supra,* of said chapter, makes the provisions of the general election law control, and the officers of the election should have taken and suhscribed to the oath prescribed by the late election law, but no fraud or collusion is alleged on the part of the officers, nor is it charged that the failure of said officers to take the proper oath was wilful neglect; but, on the other hand, it is admitted that there was no fraud in the election, and that the taking of the oath prescribed by the former law was a result of a misapprehension of the election officers as to what law applied. In the absence of the allegations of fraud or collusion or wilful neglect on the part

of the officers in failing to take the oath prescribed by law, and without allegations that such failure of the officers in any way influenced the general results of the election, such omission, although an irregularity, will not invalidate the entire election. *Whipley v. McCune,* 12 Cal. 352; *Sanders v. Lacks,* 142 Mo. 255, 43 S. W. 653; *People v. Cook,* 8 N. Y. 67, 59 Am. Dec. 451; *Taylor v. Taylor et al.,* 10 Minn. 107 (Gil. 81).

We are of the opinion that the writ of mandamus prayed for by petitioners should issue, and it is so ordered.

All the Justices concur.