99 P.2d 462

**HUTCHESON v. ATHERTON et al.**

No. 4529.

Supreme Court of New Mexico.

Jan. 13, 1940.

Rehearing Denied March 8, 1940.

Owen B. Marron, Dist. Atty., and Donald B. Moses, Asst. Dist. Atty., both of Albuquerque, for appellants.

Sam Dazzo, Scott H. Mabry, and Rolando J. Matteucci, all of Albuquerque, for appellee.

Coors & Adams, Rodey & Dickason and Simms, Modrall & Seymour, all of Albuquerque, amici curiae.

SADLER, Justice.

The validity of two bond issues about to be negotiated by the board of county commissioners of Bernalillo County is involved in this suit. The plaintiff, a taxpayer, seeks to enjoin issuance of the bonds. His first cause of action challenges an issue in the amount of $50,000.00, to be sold for the purpose of raising funds to erect a juvenile detention home under the authority of L.1939, c. 75. The second cause of action questions the right to issue bonds to the amount of $250,000.00, the proceeds to be used to construct an auditorium in Bernalillo County pursuant to authority contained in L.1939, c. 149. The members of the board of county commissioners of Bernalillo County, as such board, are the defendants.

The claimed invalidity of the proposed fifty thousand dollar issue is set forth in paragraph 3 the first cause of action, as follows:

"That Chapter 75, Session Laws of 1939 of State of New Mexico, is repugnant and violates Article IX, Section 10, and Article IV, Section 24, Constitution State of New Mexico in the following:

"a. That the limiting of detention homes for juveniles to first class counties is an unreasonable classification;

"b. That because of said limitation, the said statute becomes special in character;

"c. That a juvenile detention home is not a necessary public building within the contemplation of Article IX, Section 10, New Mexico Constitution."

The proposed two hundred and fifty thousand dollar issue is assailed in the second cause of action upon the following grounds, to-wit:

"That Chapter 149, Session Laws 1939, is repugnant and unconstitutional in the following:

"a. That an auditorium is not such a necessary public building within the contemplation of Article IX, Section 10, Constitution of State of New Mexico.

"b. That the purpose expressed therein is a direct aid to a public or private corporation within the scope of Article IX, Section 14, Constitution State of New Mexico.

"c. That the subject of the act is not expressed in the title thereof."

These challenges to the validity of the proposed bond issues were met by separate demurrers sufficient to invoke judgment of the trial court as to each ground urged to support injunctive relief. The demurrer was sustained in its entirety as to the first cause of action involving the fifty thousand dollar issue for erection of a juvenile detention home. As to the second cause of action, however, a split ruling resulted, the trial court sustaining the first ground of the demurrer and overruling it as to the second and third grounds. This was as much as to say that the proposed auditorium was a necessary public building within the purview of Const. Art. IX, § 10, but that the plan announced for financing its construction involved extending aid to a public or private corporation contrary to the provisions of Const., Art. IX, § 14; and, also, that the subject of the act, L. 1939, c. 149, was not expressed in its title as required by Const., Art. IV, § 16.

The plaintiff and the defendants having declined to plead further, the trial court entered judgment dismissing the complaint as to the first cause of action and permanently enjoining defendants from issuing the proposed bonds for construction of an auditorium. Both sides have appealed, the plaintiff complaining of the injunction awarded, the defendants of the injunction denied.

We shall dispose of the appeals in the order in which the matter was presented below, considering first the proposed fifty thousand dollar issue for construction of a juvenile detention home. It is assailed in plaintiff's first cause of action. This re-

sults in now taking up one phase of his cross-appeal.

The statutory authorization for this bond issue is to be found in L.1939, c. 75, the first section of which reads: "Section 1. That the Board of County Commissioners of first class counties in this state are hereby authorized and empowered to establish and equip juvenile detention homes and for that purpose to issue bonds of such counties in any sum necessary, not to exceed $50,000.00. Such juvenile detention homes are hereby declared to be necessary public buildings."

Section 2 of the act provides that the proceedings for calling, holding and canvassing the results of an election to determine whether such bonds are to be issued, the manner of issuance, the terms and provisions of the bonds, the sale thereof, the levy of taxes for the payment thereof, and the manner and time of payment, shall all be the same as at the time is provided by law with respect to bonds issued for the purpose of building court houses, and that, in general, all the provisions of law with respect to county court house bonds shall, so far as pertinent, apply to the bonds authorized by the act. The proposal to issue the bonds was thus duly submitted to the qualified electors of Bernalillo County, and a majority of them voted in favor of issuance.

The first and second grounds of demurrer to the first cause of action, renewed before us as assignments of error, are so interdependent that a decision as to one resolves the other. The first is, that confining to first class counties the authorization contained in L.1939, c. 75 to issue bonds for the construction of detention homes for juvenile delinquents, constitutes an unreasonable classification. If it does, the statute is a local or special law in contravention of Const. Art. IV, § 24, which is made the basis of the second ground of demurrer. Counsel for defendants have not pointed out the particular class of local or special laws inveighed against in the constitution which it is claimed this measure offends. It is only local or special laws relating to enumerated subjects and those to which a general law can be made applicable, that are proscribed by the constitution. Scarbrough v. Wooten, 23 N.M. 616, 170 P. 743. In as much, however, as laws "regulating county, precinct or district affairs" constitute one of the enumerated subjects, we will treat the questioned legislation as falling under it and, if local or special, it is, of course, invalid.

The argument put forward by the plaintiff is that there is no reasonable basis for the discrimination claimed to exist as between first class counties and those of lower rank in the scale adopted by the legislature for the purpose of fixing the salaries of county officers. The second state legislature (L.1915, c. 12) enacted what is known as the county salary law. As amended it appears now as Article 32 of Chapter 33, New Mexico Statutes Annotated, Compilation of 1929; New Mexico Supplement, (1938) by W. H. Court-

right Publishing Co., and L.1939, Chapters 58, 97, 107, 120, 128 and 221. The basis of the classification into first, second, third, fourth and fifth class counties is the assessed valuation of taxable property within the several counties. Plaintiff says this may serve very well as a ground of classification and be deemed reasonable for the purpose originally employed, the fixing of salaries for county officers, but that it is wholly arbitrary and capricious as a yard stick for determining what counties shall not be permitted to provide themselves with homes for juvenile delinquents. The legislature, runs the argument, could as well authorize certain counties to provide jails and deny the privilege to others. Poverty stricken counties, they assert, have a problem in juvenile delinquency, as well as the wealthier counties of the state, the difference being one of degree only.

Such argument, addressed to the legislature whose duty it is in the first instance to determine such matters, might have been very persuasive in moving it, upon a question of policy, to reject the classification made. When it has spoken, however, the question of wisdom or unwisdom in its decision is usually settled. Its voice is supreme upon the subject of classification for purposes of legislation so long as there is to be found any reasonable basis for the distinction employed. The fact that it appears unreasonable to the courts is not decisive. Is it so wholly devoid of any semblance of reason to support it, as to amount to mere caprice, depending on legislative fiat alone for support? If so, it will be stricken down as violating constitutional guaranties. But the fact that the legislature has adopted the classification is entitled to great weight.

"If the classification is reasonable, it is valid. It is in the first instance a legislative question as to whether or not the classification is reasonable; that is, could it have seemed reasonable to the Legislature even though such basis seems to the court to be unreasonable, or is it arbitrary and unjust? * * *

"This question is reviewed by the Supreme Court of the United States in Louisville & Nashville R. Co. v. Melton, 218 U.S. 36, 30 S.Ct. 676, 54 L.Ed. 921, 47 L.R.A. (N.S.) 84, also in Orient Insurance Co. v. Daggs, 172 U.S. 557, 19 S.Ct. 281, 43 L.Ed. 552, where it is held that the Legislature of a state has necessarily a wide range of discrimination in distinguishing, selecting, and classifying; that it is sufficient to satisfy the demands of the Constitution if the classification is practical and not palpably arbitrary." Davy v. McNeill, 31 N.M. 7, 240 P. 482, 486. See, also, Codlin v. Kohlhousen, 9 N.M. 565, 58 P. 499; State v. Eldodt, 33 N.M. 347, 267 P. 55; and Ex parte Ashton, 231 Ala. 497, 165 So. 773, 104 A.L.R. 54.

Viewing the statute, then, in the light of the presumption of validity attending it and giving due consideration to the wide scope accorded the legislature in the matter of "distinguishing, selecting, and classifying" (Davy v. McNeill) for purposes of legislation, we sustain the classi-

fication employed as a reasonable one; at least, not so unreasonable as to seem arbitrary or capricious. With this conclusion falls the contention that the statute is a local or special law. The following decisions of our own court support the conclusion reached. Codlin v. Kohlhousen, 9 N.M. 565, 58 P. 499; State v. Atchison, T. & S. F. R. Co., 20 N.M. 562, 151 P. 305; Scarbrough v. Wooten, 23 N.M. 616, 170 P. 743; McKinley County Board of Education v. State Tax Commission, 28 N.M. 221, 210 P. 565; Davy v. McNeill, 31 N.M. 7, 240 P. 482. In two of the cited cases, to be sure, State v. Atchison, T. & S. F. R. Co. and Scarbrough v. Wooten, the legislation attacked was held to be special and local but the opinions are helpful in demonstrating what is and what is not a local or special law. The Scarbrough case involved the validity of an act classifying counties. The act itself declared Bernalillo and San Miguel to be first class counties and made no provision whereby other counties under changing conditions might attain that class. The court said [20 N.M. 562, 151 P. 306]: "It is therefore clear that, when the two acts are read together, they authorize the levy and collection of the special tax in question in the two counties of Bernalillo and San Miguel and in none other. It is equally plain that the classification of the counties by the act of 1897 made no provision whereby other counties might enter into the privileges of any class, or be relieved from the responsibilities thereof, by reason of changed conditions developing in the future. In other words, there was no basis for the classification, such as the assessed valuation of the counties, which was adopted as the basis of all subsequent classification statutes. We have in the act of 1897 a legislative declaration that certain counties, therein named, shall be 'counties of the first class' until such time as the Legislature shall elect to make other and different classification of the counties. Should a shifting population, or numerous other conditions, make the classification either unfair or burdensome, there could be no relief until the Legislature revoked the law and made different provisions."

No such objection exists in reference to the classification here adopted being based upon a factor, assessed valuation, tacitly approved in the portion of the opinion just quoted.

In Codlin v. Kohlhousen, supra, the court said [9 N.M. 565, 58 P. 501]: "From the cases of State v. City of Kansas City [50 Kan. 508, 31 P. 1100] and State v. Spaude [37 Minn. 322, 34 N.W. 164], above referred to, it is clear that, to be a general law, it is not necessary that it shall operate upon all of the counties or cities and towns of the state or territory. Almost every state and territory has classified its counties and cities by population, wealth, or otherwise, and the courts have sustained these classifications wherever they are not purely arbitrary and without reason for such discrimination. Such classification may be made by direct enactment or may be based upon circumstances

and conditions which are natural, reasonable, and germane to the subject-matter of the legislative act."

When we consider the fact that the nine first class counties of the state, Bernalillo, Chavez, Colfax, Dona Ana, Eddy, Grant, Lea, San Miguel and Santa Fe, according to the 1930 census, contained within their boundaries approximately fifty percent. of the total population of the entire thirty-one counties and assume that ratio persisted when L.1939, c. 75 was enacted, the reasons likely moving the legislature to enact as it did become more apparent. It is common knowledge that the problem of juvenile delinquency grows more acute progressively with an increasing density of population. We may take judicial notice of the fact that within the first class counties named are located the cities of Albuquerque, Roswell, Raton, Las Cruces, Carlsbad, Silver City, Hobbs, Las Vegas and Santa Fe. And if the legislature, taking note of the fact that the nine first class counties, the better able financially to construct homes for juvenile delinquents, had a more emergent need thus to segregate the juvenile offenders from hardened criminals, and authorized them to make provision therefor, we are unable to say it was not a proper exercise of its legislative power to do so. The law wisely does not require perfection by the legislature in the art of classifying.

This leaves for consideration in opposition to the fifty thousand dollar issue for construction of the juvenile delin-

quent home the single contention that such a home is not a necessary public building within the language of Const., Art. IX, § 10, reading: "No county shall borrow money except for the purpose of erecting necessary public buildings * * *". There cannot be the slightest doubt that a juvenile detention home is a public building. One may as well argue that a county jail for adult prisoners is not a public building as to contend that a home for the detention of juvenile delinquents is not a public building. In view of the fact, however, that provision for such homes in this state represents an innovation; that heretofore first class counties as well as all counties have gotten along without them, the inquiry must be answered whether such a home is a "necessary" public building. If it is not, no county of the state may become indebted therefor.

If the word "necessary" be given the severest meaning which it is capable of bearing, the trial court may have erred in concluding that the detention home is a necessary public building. For, if the context renders it necessary, it may carry the implication intended in the use just made of it,—"indispensable". In McCulloch v. Maryland, 4 Wheat. 316, 413, 4 L.Ed. 579, the United States Supreme Court at an early date was called upon to ascertain its meaning as employed in the constitution authorizing congress to pass all laws "necessary and proper" to carry into effect the powers conferred. The contention was urged that the word "necessary" carried the more rigorous meaning, "absolutely neces-

sary"; "indispensable". In rejecting the argument, the court said: "Is it true, that this is the sense in which the word 'necessary' is always used? Does it always import an absolute physical necessity, so strong, that one thing to which another may be termed necessary, cannot exist without that other? We think it does not. If reference be had to its use, in the common affairs of the world, or in approved authors, we find that it frequently imports no more than that one thing is convenient, or useful, or essential to another. * * * Almost all compositions contain words, which, taken in their rigorous sense, would convey a meaning different from that which is obviously intended. It is essential to just construction, that many words which import something excessive, should be understood in a more mitigated sense—in that sense which common usage justifies. The word 'necessary' is of this description. It has not a fixed character, peculiar to itself. It admits of all degrees of comparison; and is often connected with other words, which increase or diminish the impression the mind receives of the urgency it imports. A thing may be necessary, very necessary, absolutely or indispensably necessary. To no mind would the same idea be conveyed by these several phrases."

The court having concluded that the ultimate meaning which the word could bear would too greatly hamper the congress in executing the conferred powers, rejected same as unintended and gave it the more elastic definition suggested in the language of the opinion just quoted.

In State ex rel. Lucero v. Marron, 17 N. M. 304, 128 P. 485, 491, this court was called upon to decide whether a given appropriation of fifty thousand dollars embraced in the general appropriation bill was properly there within Const., Art. IV, § 16, permitting inclusion only of appropriations for certain enumerated purposes and for "other expenses required by existing laws". This involved an interpretation of the meaning to be given the word "required". The court adopted a construction similar to that employed in defining the word "necessary" in McCulloch v. Maryland, supra, and, among other things, said:

"Now, does the word 'necessary' or 'required,' as used in the Constitution, import an absolute physical necessity, from which there is no escape, an overpowering and compelling need, and is it only such requirements of existing laws for which appropriations may be made by the Legislature? We do not think such a meaning should be given to the words, but rather they should receive the interpretation, given to the word 'necessary,' by the Supreme Court of the United States, in the case of McCulloch v. Maryland, 4 Wheat. [316] 324 [4 L.Ed. 579], when it had before it the clause of the Constitution of the United States empowering congress to pass all laws 'necessary and proper' to carry into execution the powers conferred upon it, wherein the court uses this language: [here occurs lengthy quotation from McCulloch v. Maryland].

\* \* \* \* \* \*

"We must conclude therefore, that 'necessary' or 'required,' in connection with ex-

penses, does not mean those expenses which are absolutely indispensable and without which government could not be maintained, but that it 'imports no more than that one thing is convenient or useful or essential to another,' and that the choice of what may be so convenient, useful, or essential is necessarily left to the Legislature and cannot be reviewed by the courts."

It is not unreasonable to assume the constitution makers were familiar with the employment of the word "necessary" under similar circumstances in territorial statutes. C.L.1897, § 2402, subsections 5 and 56 (now 1929 Comp., § 90-402, same subsections), had been a part of the municipal code since its enactment as L.1884, c. 39. The statute conferred power on municipalities:

"Fifth. To erect all *needful* buildings for the use of the city or town. * * *

"Fifty-sixth. To provide for the erection and care of all public buildings *necessary* for the use of the town". (Italics ours.)

The territorial legislature thus in the same act had used the words "needful" and "necessary" synonymously. In view of the harsh consequences of a contrary holding, we think the word as employed in this part of the constitution does not call for a more rigorous meaning. To hold differently, would forever proscribe the counties of our state, short of constitutional changes, from providing housing facilities for public activities however much such activities might contribute to the moral, political and economic welfare of the people, if to do so seemed to exceed the outward limits of

barest necessity. We think we do no violence in holding that as cast in this setting it was never intended to carry such a restricted meaning.

It is to be noted that L.1939, c. 75, contains an express declaration as follows: "Such juvenile detention homes are hereby declared to be necessary public buildings." Section 1. While not bound by this legislative characterization of the building, nevertheless, its judgment is entitled to great weight when the matter comes before the courts for determination. Palpable error in its conclusion must appear before the courts will reject same. Los Angeles County v. Dodge, 51 Cal.App. 492, 197 P. 403; McNichols v. City and County of Denver, 101 Colo. 316, 74 P.2d 99; Halbruegger v. City of St. Louis, 302 Mo. 573, 262 S.W. 379. We have no hesitancy in upholding the conclusion of the trial court that a juvenile detention home is a necessary public building within the true meaning of this constitutional provision.

This brings us to a consideration of the appeal of the defendants from so much of the trial court's judgment as held invalid the proposed two hundred fifty thousand dollar bond issue to be employed in constructing a public auditorium in fulfillment of the legislative authorization to counties of the state found in L.1939, c. 149, to cooperate with the "New Mexico Fourth Centennial Coronado Corporation" in conducting an exposition commemorating the four hundredth anniversary of the arrival in New Mexico in 1540 of Francisco

Vasquez de Coronado. The questions being raised by the demurrer, the trial court in its ruling in effect held that L. 1939, c. 149, violated two constitutional provisions, viz.: (1) Const., Art. IX, § 14, prohibiting any county from pledging its credit in aid of a public or private corporation, and (2) Const., Art. IV, § 16, requiring that the subject of every bill shall be expressed in its title. In view of our conclusion that this act does attempt to authorize counties to pledge their credit in aid of public or private corporations, it becomes unnecessary to decide whether the subject of the act is clearly expressed in its title as contended by plaintiff on his cross-appeal or to determine the further question presented by defendants on their appeal that the proposed auditorium is a necessary public building within the meaning of Const., Art. IX, § 10. We proceed to give the reasons for our conclusion on the decisive question.

In order that we may intelligently present such reasons it is necessary to quote L. 1939, c. 149, at length, including its title. The act reads as follows:

"An Act Authorizing Counties, Cities, Towns, and Villages to Cooperate With the 'New Mexico Fourth Centennial Coronado Corporation' With Reference to an Exposition Commemorating the 400th Anniversary of the Arrival in New Mexico in 1540 of Francisco Vasquez de Coronado; Authorizing the Construction of Auditoriums in Connection Therewith; and Authorizing the Issuance and Sale of Bonds by the Several Counties, Cities, Towns, and Villages for the Purposes Herein Set Forth.

"Senate Bill No. 91; Approved March 11, 1939.

"Be It Enacted by the Legislature of the State of New Mexico:

"Section 1. Each and all of the several counties, cities, towns, and villages of this state are hereby authorized to cooperate with the 'New Mexico Fourth Centennial Coronado Corporation' in creating, establishing, operating and conducting an exposition commemorating the four hundredth anniversary of the arrival in New Mexico in 1540 of Francisco Vasquez de Coronado. To that end, each of said counties is authorized to acquire a site for and to construct at the respective county seats therein an auditorium, suitable and appropriate as a meeting place for delegates and other persons attending said exposition, and designed, in general, to facilitate and effectuate the purposes and objects of said corporation and exposition, and every city, town, or village is authorized to acquire a site for and to construct within the corporate limits of such city, town, or village an auditorium suitable and appropriate as a meeting place for delegates and other persons attending said exposition, and designed, in general, to facilitate and effectuate the purposes and objects of said corporation and exposition.

"Section 2. In order to raise funds for the purposes hereinabove set forth, any county, city, town, or village is hereby au-

thorized and empowered to issue bonds of such county, city, town, or village.

"Section 3. The proceedings for calling, holding and canvassing the results of an election to determine whether such bonds are to be issued, the manner of issuance and the terms and provisions of such bonds, the sale thereof, the levy of taxes for the payment thereof, and the manner and time of payment thereof shall all be the same as is now or may hereafter be provided by law with respect to bonds issued for the purpose of building public buildings authorized by law to be built by such city, town, or village and, in general, all of the provisions of law with respect to bonds for public building propositions applicable to counties, or in the case of cities, towns, and villages, applicable to such municipalities shall, so far as applicable, apply to the bonds herein authorized.

"Section 4. The respective governing authorities of such counties, cities, towns, or villages are authorized and empowered to seek and obtain, if possible, from the United States government, or any department or agency thereof, financial aid and assistance to carry into effect the purposes hereof. Such governing authorities are also authorized and empowered in their discretion to accept gifts and donations of any kind or character from any source whatsoever, including, but not limited to, a site for any such auditorium.

"Section 5. In no case shall any governing authorities of such county, city, town, or village expend for a site for any such auditorium any sum in excess of ten per cent of the total cost of construction of such auditorium.

"Section 6. The governing authorities of the several counties, cities, towns, and villages are hereby authorized and empowered to enter into any and all contracts and to do and perform any and all things necessary and proper to carry into effect the provisions hereof.

"Section 7. Any auditorium constructed pursuant hereto shall be under the supervision and control of the governing authorities of the county, city, town, or village, wherein it is located, and, after it has served the purposes hereinabove set forth, shall be maintained and used for such other public purposes as such governing authorities may from time to time determine."

This constitutional provision has been before us for consideration at least three times heretofore. Harrington v. Atteberry, 21 N.M. 50, 153 P. 1041; In re Gibson, 35 N.M. 550, 4 P.2d 643, and White v. Board of Education of Silver City, 42 N.M. 94, 75 P.2d 712. Nothing decisive appears in either of the two later cases. In the Gibson case which presented a challenge to the State Bar Act (L. 1925, c. 100, as amended by L.1927, c. 113) the claimed violation was not pressed upon us beyond the stage of mere assertion. There was no argument in support of the contention. We satisfied ourselves that the claim was without merit. The basis for the challenge there differs so material-

ly from that here presented that the decision affords no aid in the solution of the question now presented.

The same may be said of White v. Board of Education of Silver City, supra. School District No. 1 in Grant County (being the municipal school district of the town of Silver City), proposed to join with New Mexico Normal School (a State educational institution), under the authority of L.1937, c. 36, in the erection and furnishing of a high school building and the purchase of grounds for the same. It was a wholly cooperative plan worked out by the legislature whereby the school district as one in which was located a State school, conducting a high school as a part thereof under control of its governing body, was permitted to vote and sell bonds "for the purpose of joining with such State Educational Institution in erecting and furnishing of high school buildings or the purchasing of school grounds therefor". L. 1937, c. 36, § 1. We held, apropos the contention that such cooperation amounted to a pledge of credit by the school district in aid of the Normal School in violation of Const., Art. IX, § 14, that the direct, tangible benefits accruing to the school district from the arrangement freed it from the claim of unconstitutionality; that such pledging of credit as occurred was for its own benefit and not in aid of the Normal School and that it appeared to be getting a quid pro quo in advantages and property rights for every dollar put out. Finally, in quoting approvingly Chief Justice

Roberts' discussion of Elting v. Hickman, 172 Mo. 237, 72 S.W. 700, we suggested the correctness of his conclusion that this constitutional provision was inapplicable to aid extended under legislative authority by one subordinate governmental agency to another. This leaves for consideration in our own decisions the case of Harrington v. Atteberry, supra, decided shortly after statehood. The suit was one to enjoin the board of county commissioners of San Juan County from making an appropriation of certain county funds to the San Juan County Fair Association, a domestic corporation, organized under the general corporation laws, for the purpose of conducting a fair at Aztec in said county. The appropriation was to be made under L.1913, c. 51, commanding the board of county commissioners of each county to appropriate annually the sum of not less than five hundred dollars from the general fund of the county to a regularly organized and incorporated county fair, to be applied towards paying premiums "in the agricultural, horticultural, arts and livestock exhibit premiums".

We sustained the trial court's judgment making permanent a temporary injunction previously issued restraining the appropriation. The opinion first appearing in the reports was by Chief Justice Roberts. He rested it squarely upon the proposition that the theatened appropriation would violate Const., Art. IX, § 14, in that it would constitute a donation by the county to the incorporated fair association. Mr.

Justice Hanna in a separate opinion in which he was joined by Mr. Justice Parker, concurred in the result, but solely upon the ground that it was an appropriation "for charitable, educational or other benevolent purposes" [21 N.M. 50, 153 P. 1050] to an association or corporation, not under the absolute control of the state, in violation of Const., Art. IV, § 31.

Thus, a majority of the court as then constituted disagreed with the Chief Justice in his conclusion that a violation of section 14 of Article IX of the Constitution appeared. In view of the ground upon which the majority rested their decision it is debatable whether what was said by them concerning Const., Art. IX, § 14, is not obiter dictum. This we need not decide. Nor, in view of the difference in the facts of the Harrington case and the one before us, is it necessary to overrule it, even if considered stare decisis. It is enough to say that the reasoning of the Chief Justice, as applied to the facts of the present case, and the persuasive effect of the many decisions reviewed at length by him, quite satisfy us that the act in question does attempt to authorize the counties and municipalities of the state to pledge their credit in aid of the Coronado Corporation contrary to this provision of the constitution.

We quote from the opinion of Chief Justice Roberts language not inapplicable to the present case, as follows:

"It is argued by appellants that the county commissioners have a right to 'expend public funds for the general welfare of the county; that the prosperity of the state depends, to a large degree, upon the success of its horticultural and agricultural industries; that the encouragement of these pursuits, and the education of those engaged and desiring to engage in such vocations, is a public duty, for which public funds may be lawfully expended, if legislative authority therefor exists, without violating any constitutional provision. All this may be admitted to be true, and still it does not alter or affect the present question. Here the Legislature has not authorized the boards of county commissioners to expend public funds for such purpose, but has directed the paying over of such funds to a corporation, not under the control of the county or state, to be used by such corporation in discharging an obligation assumed by it, thereby relieving it of the expenditure of its own funds, to the extent of the aid advanced by the county. It is true the holding of a county fair, at which the agricultural, horticultural, and other resources and products of the county are exhibited and premiums awarded for the superior product, is educational in its nature and serves a public purpose; but, if this were the criterion by which the validity of an appropriation of public funds is to be measured, there would be hardly any limit upon the right of the state, county, city, or school districts to appropriate money to a private corporation. Within the state we have many private corporations engaged in educational work and a still greater number serve

some other useful public purpose. Private individuals are likewise engaged in pursuits of a similar nature. If all these individuals and corporations could be given public money to aid them in carrying on the work in which they are engaged, there would practically be no limit upon the various agencies of government in the expenditure or donation of public funds, and the constitutional provision in question would be a vain, useless, absurd, and meaningless aggregation of words and sentences.

"The language of the constitutional provision is so clear and explicit that it does not require construction; all that need be done is to read it and apply the language in its ordinary sense. It prohibits the state, county, and other agencies of the state named, from making any donation to or in aid of any person, association, or public or private corporation, except as otherwise provided in the Constitution. Therefore an act of the Legislature appropriating money, or directing a county to appropriate money to a private corporation engaged in conducting a county fair, for the purpose of paying premiums on agricultural and horticultural and other exhibits, which is a duty assumed by such corporation, is in conflict with section 14 of article 9 of the state Constitution, prohibiting donations to persons, associations, and public and private corporations."

We are not unmindful of the fact that in promoting a state wide celebration commemorating the four hundredth anniversary of the heroic exploration of New Mexico by Francisco Vasquez de Coronado, the "New Mexico Fourth Centennial Coronado Corporation", hereinafter and heretofore called Coronado Corporation, is engaged in serving a highly commendable public purpose. But that fact alone does not warrant the State or any county or city in making a donation or pledging its credit in aid of it. As so aptly observed in the opinion just quoted from, there being many private corporations engaged in laudable public enterprises, if this were the criterion, "there would practically be no limit upon the various agencies of government in the expenditure or donation of public funds".

Very little is disclosed by the pleadings as to the exact nature of the Coronado Corporation. It has been assumed by the parties that it is a corporation and for purposes of our decision we may even concede it to be a non-profit corporation without shareholders in the ordinary sense, composed of a group of public spirited, patriotic citizens who have banded themselves together for the purpose of appropriately celebrating a great event in New Mexico history. This fact, however, does not make it a proper subject of governmental bounty. It is not a subordinate governmental agency. And the mere fact that the work in which it is engaged is of great educational and patriotic value, which all will admit, does not legally entitle it to state or county aid.

There really are but two important considerations in resolving the

question presented, the one in a way a corollary of the other. First: Is the county authorized to pledge its credit in aid of the Coronado Corporation? And, second: May L.1939, c. 149, be sustained as legislation authorizing counties to provide the auditoriums as necessary public buildings? If we answer the first question affirmatively, we are compelled to supply a negative response to the second.

It may be fairly assumed that the sole object of the existence of the Coronado Corporation is to promote the Coronado fourth centennial celebration. One of its first and most important duties will be to provide housing facilities for those attending either as participants, delegates or spectators,—and at the same time this becomes one of its heaviest financial obligations. To the extent the corporation is relieved of this heavy burden, unquestionably it is aided. Aid is extended by the county's pledge of its credit. In the Harrington case, Chief Justice Roberts said: "By the act in question the board of county commissioners is authorized to pay to such association annually the sum of not less than $500 to be used for the purpose of discharging an obligation assumed by and resting upon the corporation, viz., the payment of premiums which it offers for agricultural and horticultural exhibits."

This can be paraphrased to meet the present situation as follows: "By the act in question the board of county commissioners is authorized, subject to an approving vote of the qualified electorate, to issue bonds in any amount determined, the proceeds to be used for the purpose of discharging an obligation assumed by and resting upon the corporation, viz., the furnishing of housing facilities for the celebration proposed to be held."

In our opinion the aid thus extended by Bernalillo County to the corporation is not of an incidental or inconsequential nature. On the contrary it is direct and substantial. It is a plain violation of the constitutional provision in question.

This conclusion drives us to the view that the act is not one whose primary purpose is to authorize municipalities to provide themselves with necessary public buildings. The authorities are many to the effect that a public auditorium is a public building and fulfills a public purpose. 19 R.C.L. 721, § 29; Halbruegger v. City of St. Louis, 302 Mo. 573, 262 S.W. 379; Adams v. City of Durham, 189 N.C. 232, 126 S.E. 611; Egan v. City & County of San Francisco, 165 Cal. 576, 133 P. 294, Ann.Cas.1915A, 754; City & County of Denver v. Hallett, 34 Colo. 393, 83 P. 1066; Wilkerson v. City of Lexington, 188 Ky. 381, 222 S.W. 74; Anderson v. Thomas, 166 La. 512, 117 So. 573; State ex rel. v. Barnes, 22 Okl. 191, 97 P. 997. See, also, Cathcart v. City of Columbia, 170 S.C. 362, 170 S.E. 435, Los Angeles County v. Dodge, 51 Cal.App. 492, 197 P. 403, and Meyer v. City of Cleveland, 35 Ohio App. 20, 171 N.E. 606, where the same ruling was applied to public stadiums. Some of these authorities as well as others will even support

the statement that it is a necessary public building. Allied Architects' Ass'n v. Payne, 192 Cal. 431, 221 P. 209, 30 A.L.R. 1029 and case note, 1035; Clarke v. Inhabitants of Town of Brookfield, 81 Mo. 503, 51 Am.Rep. 243.

If we could glean from the title and language of the enabling act (L.1939, c. 149) a deliberate and motivating purpose on the part of the legislature to authorize the counties and cities of the state to provide themselves with public auditoriums as necessary public buildings with their use for purposes of the Coronado Corporation as a mere incident, we should perhaps find no difficulty in sustaining the act. But when it appears so obviously that it is just the reverse; that the major purpose of the act is to aid the Coronado Corporation by providing it an auditorium with the only thing which under any condition will sustain the power to borrow money,—"to erect necessary public buildings",—an incident,—then are we forced to the conclusion that there is here wanting that declaration of public necessity contemplated by the constitution as a basis for exercising the county's borrowing power. As was said in Wheelock v. City of Lowell, 196 Mass. 220, 81 N.E. 977, 978, 124 Am. St.Rep. 543, 12 Ann.Cas. 1109: "If the dominating motive for the erection of the hall is a strictly public use, then the expenditure for it is legal, although incidentally it may be devoted occasionally to uses which are not public. If, however, the project of the defendant city is merely

colorable, masking under the pretext of a public purpose, a general design to enter into the private business of maintaining a public hall for gain, or devoting it mainly to any other than its public use as a gathering place for citizens generally, such an attempt would be a perversion of power and a nullity and no public funds could be appropriated for it."

Practically the only language in the act to which the defendants may turn for escape from the conclusion announced is section 7, the very last one, reading: "Any auditorium constructed pursuant hereto shall be under the supervision and control of the governing authorities of the county, city, town, or village, wherein it is located, and, *after it has served the purposes hereinabove set forth,* shall be maintained and used for such other public purposes as such governing authorities may from time to time determine." (Italics ours.)

No further proof is needed that public necessity in relation to the building is the incident and aid to the Coronado Corporation in promoting the fourth centennial the primary, major purpose, than the language we have italicized in quoting section 7. To permit the language of this section to control in the face of the rest of the act and its title would be letting "the tail wag the dog." That danger would lurk in doing so is apparent. Whether the qualified electorate in a given county, freed from the mass psychology favorable to an approaching celebration of mammoth proportions, would favor a proposed bond issue in large

amount, solely upon the long range use for such a building, would always be open to speculation. Unless a majority did so favor, with no celebration in the offing, an essential declaration of public necessity is wanting.

Two additional considerations lend weight to the conclusion that aid to the Coronado Corporation in promoting the fourth centennial celebration was the primary motive behind the legislation and other and later use by the public a secondary thought. First, although the governing board of the county is given supervision and control of the building that control is qualified in the very sentence of section 7 granting it by language rendering it certain that use of the building as "a meeting place for delegates and other persons attending said exposition" could not be denied. Note the language of section 7 following the giving of supervision and control into the hands of the county commissioners: " * * * and, after it [the auditorium] has served the purposes hereinabove set forth, shall be maintained and used for such other public purposes as such governing authorities may from time to time determine". Unquestionably, as a reading of the whole act and particularly

section 7 will demonstrate, mandamus would lie at the instance of the Coronado Corporation to compel the granting of preferential use to it during the celebration even as against another public use of equal magnitude or importance.

Furthermore, that authority in counties and cities to provide auditoriums as necessary public buildings is not the root of the enabling act is rendered obvious by the fact that such authority expires coincidentally with the lapse of that period of time within which such a building could be constructed and rendered available for purposes of the celebration. If one for a moment harbors the thought that a county or city could use this act as authority to become indebted for construction of a public auditorium after the Coronado celebration is over, one has only to read the act to be disillusioned. And, yet, the need for a public building of this character would increase with the passage of time and the consequent growth of population.

We find no error in the judgment reviewed. Accordingly it will be affirmed and it is so ordered.

BICKLEY, C. J., and BRICE, ZINN, and MABRY, JJ., concur.